**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NANCY SUE SPEIDELL, | ) | CASE NO. 3:21-CV-02284-JJH |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I. Introduction

Plaintiff, Nancy Sue Speidell ("Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

## II. Procedural History

On August 28, 2019, Claimant filed applications for DIB, alleging a disability onset date of June 1, 2014. (ECF No 7 at 1). The applications were denied initially and upon reconsideration, so Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 5, PageID #: 176–77). On January 11, 2021, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 5, PageID #: 95–123). On February 22, 2021, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 5, PageID

#: 73). The ALJ's decision became final on October 20, 2021, when the Appeals Council declined further review. (ECF No. 5, PageID #: 50).

On March 17, 2022, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 7 at 1). The parties have completed briefing in this case. (ECF Nos. 7, 8). Claimant asserts the following assignments of error:

(1) The ALJ failed to accept much of Claimant's testimony although it was consistent with the medical evidence on file.

(2) The ALJ made a faulty residual functional capacity ("RFC") which failed to consider Claimant's need to alternate between sitting, standing, and lying down. Further, there was no evidence presented that Claimant is capable of frequently handling and fingering with her right upper extremity.

(3) The ALJ erred in finding that Claimant is capable of past relevant work.

(4) The Appeals Council erred in refusing to consider evidence submitted after the hearing.

(ECF No. 7 at 2).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant alleges limitations resulting from bilateral knee osteoarthritis status post-surgeries, lumbar back pain status post-surgery, and COPD that she states restricts her ability to work. She said she could stand for about 10 minutes and then would need to sit. She could walk about 500 yards before she needed to stop and she could lift about 3-5 pounds. She said prior to her knee replacement, she could sit for 30 minutes to 1 hour before she had to get up and move around. After the replacement, she could sit for 15-30 minutes and then would need to get up and stretch. She did not think she could do her prior work because it was difficult for her to bend, sit and walk and she had breathing problems from COPD. She said her difficulty with sitting started in 2012. She said she had been working part-time for her cousin doing payroll and keeping

2

books but she only worked about 2 hours each day and sometimes those 2 hours would take her all day long to complete because she needed breaks. She said she started having knee problems in 2011 or 2012 and they kept getting worse and to the point that her knees were not bending correctly. She had replacements on both sides and her pain let up a little bit but then they realized some of her leg pain was a result of her lumbar spine issues. She had been prescribed a cane in 2018 to use as needed because she had several falls. She said her last fall had been 3 months prior to the hearing. She said she then had a lumbar fusion surgery and that helped make her spine straighter but she still had pain down both legs and her legs felt really hot and she had burning in her lower back when she walked. During one of her falls, she fractured her wrist and had to have a fixation surgery. She said her wrist would hurt after a while with activity and she would lose strength. She no longer typed with both hands and would just use one finger to type. She reported that she took pain medications for her impairments and these made her tired and caused her to take 2- hour naps almost every day. She said she did not take pain medications every day though. She said she could not bend or squat but then said if she dropped something on the ground, she would squat but used her hand to brace herself. She was most comfortable lying down or sitting with a pillow behind her back. She said it was difficult for her to transition from sitting to standing.

(ECF No. 5, PageID #: 82).

During the hearing, the ALJ posed a series of hypotheticals. The first hypothetical was as follows:

> Assume a hypothetical individual with the same age, education, and [INAUDIBLE] vocational profile as the claimant, with a residual functional capacity to perform sedentary work, except she can occasionally climb ramps and stairs; she can frequently balance; she can never climb ladders, ropes, or scaffolds; she should avoid workplace hazards, such as unprotected heights and moving mechanical parts; she should not work in areas of vibration; she should avoid working in temperature extremes, such as extreme heat and/or cold or humidity and/or wetness; she can occasionally push and pull with the right upper extremity and occasionally operate hand controls with the right upper extremity; and she should avoid concentrated exposure to pulmonary irritants, such as dust, odors, toxins, and/or fumes. Would such an individual be able to perform the claimant's past relevant work, as either actually performed or generally performed in the national economy?

3

(ECF No. 5, PageID #: 118–19). The vocational expert testified that Claimant's past work could be completed both as classified and as customarily done under these limitations, including as it was performed in this case. (ECF No. 5, PageID #: 119). In the second hypothetical, the ALJ included the ability to frequently handle and finger with the right upper extremity. (ECF No. 5, PageID #: 119). The expert testified that the past work required frequent handling and fingering and could still be completed with these abilities. (ECF No. 5, PageID #: 119). Next, the ALJ asked if the past work could be done with only the occasional ability to handle and finger, and the expert stated that the work could not be done under this limitation. (ECF No. 5, PageID #: 119).

The ALJ then added modifications to the first hypothetical. The ALJ asked if the same individual in hypothetical one could complete the past work if they had the option to alternative between sitting and standing every thirty minutes for one to two minutes. (ECF No. 5, PageID #: 120). The expert testified that the person could complete the past work with this option. (ECF No. 5, PageID #: 120). The ALJ asked if the individual could complete the past work if they were off-task more than twenty percent of the time, and the expert stated the person could not complete the job because more than ten percent of off-task time would preclude an individual from completing full-time, entry-level, unskilled work. (ECF No. 5, PageID #: 120). The expert further testified that typically only two ten- to fifteen-minute breaks are permitted in this type of work, including a thirty- to sixty-minute lunch break, and that anyone taking more than one day off a month cannot sustain full-time, entry-level, unskilled work. (ECF No. 5, PageID #: 120).

Finally, Claimant modified the sitting and standing hypothetical so that the individual would have the option to stand and stretch for five to fifteen minutes every half hour. The vocational expert testified that this option would rule out the ability to complete the past work in this case. (ECF No. 5, PageID #: 121–22).

**B.  Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

> The claimant suffered from asthma/COPD. A chest x-ray was completed in February 2015 and showed healed granulomatous changes, COPD and emphysema. (Exhibit 16F/9). In March 2015, the claimant was noted to have a history of bronchial asthma that was presently asymptomatic and she was treated with bronchodilators. (16F/23). An April 2018 chest x-ray showed granulomatous disease was noted but the lungs were clear. (Exhibit 18F/1). In July and October 2018, it was noted the claimant's asthma/COPD was well controlled. (Exhibit 3F/12, 25-26).
>
> A July 2020 X-ray of the chest showed normal heart size. Minimal fibrotic scarring right middle lobe and evidence for old, healed myelomatous disease. There were no acute findings and no infiltrates or effusions were seen. (Exhibit 19F/7). In October 2020, it was noted the claimant's asthma/COPD was well controlled. (Exhibit 14F/11).
>
> The claimant also suffered from osteoarthritis in her bilateral knees, status-post surgery. In March 2015, the claimant treated due to severe pain in her right knee with a grinding sensation. She said it had become debilitating in nature and altered her activities of daily living including rising from a seated position, walking around her home, and going up and down the stairs. (Exhibit 16F/16). X-rays of the right knee showed changes consistent with advanced right knee osteoarthritis, joint space narrowing, and spur formation was present. It was noted she had right knee advanced osteoarthritis. (16F/17). On March 18, 2015, the claimant underwent a right total knee replacement. (16F/18). Follow-up x-rays showed satisfactory positioning. (16F/21). In May 2015, it was noted the claimant was doing well post-op. (Exhibit 3F/74). In June 2015, the claimant reported significant improvement after right knee surgery. X-rays showed satisfactory positioning of the right total knee replacement. (Exhibit 20F/21). Examination showed right knee motion 2 degrees of flexion to 110 degrees, good stability, good patellar tracking, 4/5 motor strength, foot sensation was intact, and there was normal dorsalis pedis pulse. (20F/20). The claimant was to continue with a cane for her gait. (20F/19).
>
> An August 2017 MRI of the left knee showed extensive lateral meniscus tear and severe lateral femorotibial osteoarthropathy; moderate patellofemoral and mild to moderate medial femorotibial osteoarthropathy; and complex joint fluid collection with synovial

hyperplasia and possible clotted blood with no measurable loose body. (Exhibit 17F/1). The claimant reported that she had felt a pop in her knee in June 2017 and she had locking, catching, popping and grinding sensations. (17F/3). X-rays of the left knee showed osteoarthritic changes, joint space narrowing, and spurring formation was present. (Id.). On August 16, 2017, the claimant underwent a left knee arthroscopy, abrasion arthroplasty of the patellofemoral compartment, partial medial and lateral meniscectomies, and a Depo-Medrol injection to the left knee joint. (17F/8). The claimant participated in physical therapy after surgery from August 2017 through October 2017. (Exhibit 1F). In September 2017, the claimant reported that she was pleased with her knee surgery and examination showed good clinical alignment without swelling, no evidence of infection, minimal tenderness on palpation, full range of motion, negative McMurray test, her foot was neurovascularly intact, and she had a normal dorsalis pedis pulse. It was noted she was doing satisfactory and she was to continue taking Ibuprofen as needed. (Exhibit 20F/13). In October 2017, the claimant reported moderate pain in her left knee with grinding sensations. She had positive crepitance throughout range of motion and 4/5 motor muscle strength. X-rays showed osteoarthritic changes, joint space narrowing, and spurring formation. Synvisc injections were recommended but the claimant stated she was going to Texas for the winter so these were postponed until the spring. (20F/11).

In May 2018, the claimant returned to Orthopedic Institute of Ohio and reported continued locking, catching, popping and grinding sensation to her left knee with severe pain that had been ongoing for the past 5 years. (Exhibit 18F/7). X-rays showed changes consistent with primary osteoarthritic joint changes, joint space narrowing, spurring formation, and some valgus alignment noted. (18F/8). On May 16, 2018, a left total knee replacement was performed. (18F/11). X-rays in the recovery room showed satisfactory positioning of the total replacement. (18F/14). The claimant participated in physical therapy and in August 2018, she reported that she could walk more without a cane and her pain could get to 0/10. She was on vacation for most of the month of August but said she was happy with her progress and was ready to change to a home exercise program. (Exhibit 2F/10). She reported independence getting around her home and in and out of the house. (2F/12). In September 2018, the claimant stated that she was overall pleased with her left knee progress but had minimal pain. It was noted she had an antalgic gait and was walking with a cane. She admitted she was not doing her exercises faithfully and was warned the stiffness could become permanent if she did not complete these exercises.

(Exhibit 7F/12-13). In April 2019, the claimant reported minimal left knee pain and admitted she had not been doing her exercises and had been in Texas since September. She was to restart physical therapy. (7F/9-10).

In June 2019, the claimant returned to physical therapy and it was noted she had improved ease standing from the couch and she was ambulating independently. (Exhibit 5F). At a June 2019 Ortho visit, it was noted she had improvement in her left knee pain though she continued with some stiffness. Examination showed good clinical alignment, mild tenderness to palpation, motion 3 degrees of flexion to 110 degrees, good stability, good patellar tracking, 4/5 motor strength, foot sensation was intact and normal dorsalis pedal pulse. Right knee showed good clinical alignment, minimal swelling, mild tenderness to palpation, motion 3 degrees to 105 degrees flexion, good stability, good patellar tracking, 4/5 motor strength, foot sensation was intact, and normal dorsalis pedal pulse. (Exhibit 7F/6). X-rays showed satisfactory positioning of the total replacements bilaterally. (7F/7).

In October 2020, it was noted the claimant's osteoarthritis was controlled with medications and surgery. (Exhibit 14F/11). The claimant also suffered from degenerative disc disease of the lumbar spine. In June 2015, an MRI of the lumbar spine showed L4-L5 broad-based bulging disc with superimposed left foraminal and extraforaminal HNP measuring 9mm and moderately narrowing the left foramen. Facet arthropathy was contributory to the left greater than right foraminal narrowing. Abutment of the left L4 nerve root was present. There was an L3-L4 protruding disc with superimposed right foraminal HNP extruding superiorly and measuring 6mm in AP dimension. Facet arthropathy with moderate right foraminal narrowing with abutment of the right L3 nerve root. There was an L2-L3 protruding disc more prominent with the left foramen and extending extraforaminal. Mild extrusion of the disc superiorly was noted within the left foramen, which was mildly narrowed. (Exhibit 16F/34-35). X-rays showed some osteoarthritic changes and possibly spinal stenosis. (Exhibit 20F/20). In October 2015, the claimant reported hip pain but the majority of her pain was thought to be caused by her lumbar spine issues. She was to continue with Ibuprofen, Norco, cryotherapy, activity modification, and physical therapy. (Exhibit 20F/16).

In December 2015, the claimant underwent a lumbar epidural steroid injection. (Exhibit 16F/36).

A repeat lumbar MRI was done in July 2019 and showed multilevel

degenerative changes present throughout the lumbar spine that were most significant at L4-L5 where there was uncovering of the disc and ligamentum flavum thickening causing mild spinal canal narrowing of the bilateral subarticular zones. An annular fissure was also present at this level and there was mild neural foraminal narrowing on the left secondary to degenerative facet arthropathy. (Exhibit 19F/2). At an August 2019 appointment, examination showed the claimant was seated and in no acute distress, she maintained strength of 5/5 to resisted pedal push/pull and great toe extension and she was sensate throughout. Pulses were strong at the ankles bilaterally. (Exhibit 6F/8). The claimant underwent another lumbar epidural steroid injection in August 2019. (Exhibit 7F/34).

In December 2019, the claimant presented to pain management and it was noted she was ambulatory with no assistance. She reported she had lower back pain and pain into her bilateral legs but said the lumbar injection had helped. Examination showed no lumbar tenderness and positive straight leg raise supine bilaterally. Steroid injections were ordered. (Exhibit 8F/6-10). In February 2020, the claimant reported the last time she had to use Ibuprofen had been one week prior. She had another injection in January 2020 that she said provided 70% relief. (8F/12- 14). Examination showed good range of motion of the hip, knee, and ankles bilaterally with limited lumbar range of motion and negative straight leg raise bilaterally. She was to proceed with trigger point injections. (8F/17-19). In June 2020, it was noted the claimant had no relief from injections in January and March 2020. X-rays of the lumbar spine showed grade 1 anterolisthesis of L4 over L5 measuring approximately 6mm and no pars defect was appreciated. There was mild degenerative changes throughout the lumbar spine and flexion/extension views demonstrated a stable anterior listhesis of L4 over L5. (Exhibit 13F/9). The claimant exhibited strength of 5/5 knee extension and a positive straight leg raise bilaterally. She was started on Norco, Cyclobenzaprine and Zanaflex and a fusion surgery was recommended. (Id.). In July 2020, the claimant underwent another lumbar epidural steroid injection. (Exhibit 15F/18).

In August 2020, the claimant underwent L4 and L5 laminectomies and L4 and L5 bilateral posterolateral fusion of the lumbar spine. (Exhibit 19F/17). In October 2020, the claimant reported that overall she was doing well and was happy with the results of her surgeries. She said that she had significant relief of her lower extremity radicular pain and she said she still had low back burning pain with ambulation and prolonged sitting but noted improvement. She said she had been walking up to a half mile each day. (Exhibit 15F/1). She said she was leaving for Texas and would not be back until

April. She had received her bone stimulator and was using it daily and she no longer required the use of a walker or cane for ambulatory assistance. (Id.). X-rays showed pedicle screw and rod fixation at L4-L5 bilateral. There was laminar and foraminotomy appreciated at L4-L5 level. There was a stable anterior thesis measuring approximately 5.5mm and adjacent levels of L3-L4 and L5-S1 were stable in appearance. There was no evidence of hardware loosening or fracture. (15F/1-2). Examination showed maintained strength of 5/5 knee extension, dorsiflexion, EHL contraction, and plantarflexion bilaterally. Distal pulses were noted and the claimant was sensate throughout. She was told the burning sensation would improve over time and she was given restrictions of no lifting over 10 pounds, no bending and no twisting. She was to continue to advance activities as tolerated and was to continue her walking regimen and use of the bone stimulator. (15F/2).

In May 2018, the claimant fell on her right wrist and imaging showed a rather comminuted and impacted right distal radius fracture. (Exhibit 18F/26). On May 30, 2018, she underwent a closed reduction, percutaneous pinning, and application of external fixator for the right wrist. (18F/27). At an August 2018 follow-up examination, the claimant reported that she felt great and did not want anything else done for her wrist. Examination showed full range of motion of the fingers. (Exhibit 7F/14-15). X-rays showed healing nondisplaced fracture of the distal radius. (7F/37). A December 2019 examination showed adequate range of motion of the bilateral wrists. (Exhibit 8F/9)

(ECF. No. 5, PageID #: 83–86).

## C.  Opinion Evidence

Dr. Marisa Inigo, M.D. provided an internal medicine consultative examination of Claimant in March 2020 regarding her mobility and handling capabilities. Dr. Inigo opined that Claimant's ability to sit, stand, and move was mild to moderately restricted and that she could lift, carry, and handle objects. (ECF No. 5, PageID #: 150). Claimant had normal grip strength bilaterally and was unrestricted in her ability to reach, handle, finger, and feel. (ECF No. 5, PageID #: 150). Claimant also told Dr. Inigo she could write, use a coffee cup, open a jar, and use a skillet. (ECF No. 5, PageID #: 836).

9

**IV.     The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

> 3. The claimant has the following severe impairments: bilateral knee osteoarthritis status post total knee replacements, status post left arthroscopy, degenerative disc disease lumbar spine with stenosis status post laminectomy and fusion, right wrist fracture status post open reduction and internal fixation, asthma, COPD, and osteoarthritis right hand (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally climb ramps and stairs. She can frequently balance. She can never climb ladders, ropes, or scaffolds. She should avoid workplace hazards such as unprotected heights and moving mechanical parts. She should not work in areas of vibrations. She should avoid working in temperature extremes such as extreme heat and/or cold or humidity and/or wetness. She can occasionally push and pull with the right upper extremity, and can occasionally operate hand controls with the right upper extremity. She can frequently handle and finger with the right upper extremity. She should avoid concentrated exposure to pulmonary irritants such as dusts, odors, toxins, and/or fumes.
>
> 6. The claimant is capable of performing past relevant work as an Accounting Clerk (DOT 216.482-010, skilled with an SVP of 5, sedentary exertional level). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2014, through the date of this decision (20 CFR 404.1520(f)).

**V. Law & Analysis**

**A.  Standard of Review**

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**B. Standard for Disability**

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20

11

C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises four issues on appeal: (1) whether the ALJ failed to accept Claimant's subjective testimony, (2) whether the ALJ erred in its RFC determination by failing to consider Claimant's need to alternate between sitting, standing, and lying down, and whether there was evidence presented that Claimant could frequently handle or finger with her upper right extremity, (3) whether the ALJ erred in finding that Claimant was capable of past relevant work, and (4) whether the Appeals Council erred in refusing to consider evidence submitted after the hearing.

#### 1. The ALJ relied on medical records and evidence to reach her inconsistency findings about Claimant's subjective testimony

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of HHS.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider. The ALJ need not analyze all seven factors but should show that she considered the relevant evidence. *See Cross v.*

*Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304. The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248–49), report and recommendation adopted by 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

Claimant states that "the ALJ essentially played doctor by extrapolating bits and pieces from various medical records . . . and concluding that the records were inconsistent with Plaintiff's testimony and/or application for disability benefits." (ECF No. 7 at 11). Specifically, Claimant refers to three specific instances where the ALJ took issue with her testimony: (1) when the ALJ indicated that the ability to travel to Texas was inconsistent with Claimant's testimony that she could not sit for more than fifteen to thirty minutes at a time; (2) when Claimant testified she could

13

only walk 500 feet[1] and the medical records indicated she walked up to half a mile a day; and (3) when ALJ "discounted" Claimant's testimony regarding her right hand and wrist limitations. (ECF No. 7 at 9–10).

The ALJ specified the first two of Claimant's subjective complaints:

> She said she could stand for about 10 minutes and then would need to sit. She could walk about 500 yards before she needed to stop and she could lift about 3-5 pounds. She said prior to her knee replacement, she could sit for 30 minutes to 1 hour before she had to get up and move around. After the replacement, she could sit for 15-30 minutes and then would need to get up and stretch.

(ECF No. 5, PageID #: 82). Next, the ALJ provided a unified statement of reasons for discounting credibility of these statements:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because although the claimant states she was unable to sit for more than 15-30 minutes at a time, the record shows that she was able to travel to Texas almost every year and although she stated she could only walk about 500 feet, the record shows she stated in October 2020 that she was walking up to ½ mile each day.

(ECF No. 5, PageID #: 82).

First, Claimant argues that her trips to Texas are consistent with her inability to sit for more than fifteen to thirty minutes because she travels lying down, with a cushion behind her back—the most comfortable position with her condition. (ECF No. 7 at 9). She contends that the ALJ failed to consider this fact in the decision. (ECF No. 7 at 9). However, the hearing transcript indicates that Claimant never testified about her travel accommodations, and there are no medical documents or records referencing these conditions. While it is true that Claimant testified that her

---

[1] Note that Claimant actually testified she could walk 500 yards—rather than feet—without a break. (*See* ECF No. 5, PageID #: 109). Neither party, nor the ALJ, addressed this discrepancy. However, whether Claimant testified she could walk 500 feet or yards, it does not change the outcome of the ALJ's decision as 500 feet or yards are both less than half a mile.

most comfortable position is lying down with a pillow, she did not testify that she does this while traveling. (ECF No. 5, PageID #: 116). In fact, the parties did not discuss traveling at the hearing. Thus, the ALJ did not err in failing to consider Claimant's traveling accommodations because the first time Claimant referred to the accommodations was on appeal before this Court.

Claimant next takes issue with the ALJ's finding that her testimony about walking was inconsistent with the medical records. Although Claimant testified she could only walk 500 yards at a time, her medical records indicated she could walk up to half a mile a day. Claimant argues that the ALJ's finding of inconsistency was improper because Claimant could walk up to 500 yards at a time *and* walk a total of half a mile within a day. In her decision, the ALJ clearly cited a medical record from October 2020 that she believed was inconsistent with Claimant's testimony about walking. (ECF No. 5, PageID #: 82–83). The record indicates that Claimant was walking up to half a mile a day, did not require any permanent assistive devices, and was pleased with the outcome of her lumbar surgeries. (ECF No. 5, PageID #: 83). The ALJ also noted that Claimant had been noncompliant with certain home exercises that the physician warned could cause permanent knee stiffness. (ECF No. 5, PageID #83). The ALJ found that Claimant's ability to walk without permanent assistance and her satisfaction with the surgeries was inconsistent with her testimony that she had difficulty walking. Further, Claimant has not cited to any medical evidence supporting her assertion that she could only walk 500 yards at a time. Because the ALJ "clearly articulated" the records she relied on in assessing Claimant's credibility on the walking issue, including the specific physician's notes regarding Claimant's ability to walk, this Court must uphold the ALJ's credibility determination. *See* 2017 WL 5180304 at *10.

Claimant finally asserts that the ALJ "discounted Plaintiff's testimony regarding her right hand/wrist limitations, by referencing an office note from August 2018 wherein the office note

15

specifically states, 'At this stage, she feels great, she does not want anything done.'" (ECF No. 7 at 10). Claimant argues that this statement referred to an infection rather than her overall wrist health. (ECF No. 7 at 10). But the August 2018 examination clearly relates to Claimant's wrist:

> [Claimant] reported that she felt great and did not want anything else *done for her wrist.* Examination showed full range of motion of the fingers. (Exhibit 7F/14-15). X-rays showed healing nondisplaced fracture of the distal radius. (7F/37). A December 2019 examination showed adequate range of motion of the bilateral wrists. (Exhibit 8F/9)

(ECF No. 5, PageID #: 86) (emphasis added). Claimant also testified that "her wrist would hurt after a while with activity and she would lose strength. She no longer typed with both hands and would just use one finger to type." (ECF No. 5, PageID #: 82). This is also at odds with a March 2020 record the ALJ relied upon. In the 2020 record, Dr. Marisa Inigo opined that Claimant had "normal grip strength bilaterally. Her ability to reach, handle, finger and feel is unrestricted." (ECF No. 5, PageID#: 87, 149). The ALJ also relied upon Claimant's reports to Dr. Inigo that she could write, hold a coffee cup, open a jar, and use a skillet. (ECF No. 5, PageID #: 87).

After reviewing these records, this Court is persuaded by the ALJ's interpretation of the report and finds that it was reasonable for the ALJ to rely on Claimant's 2018 comments as related to her wrist, rather than an infection.

The Court is satisfied that the ALJ considered all the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's credibility findings. There exists, therefore, no compelling reason for the Court to disturb those findings. *Cross,* 373 F. Supp. 2d at 732.

### 2. The ALJ's residual functional capacity ("RFC") was consistent with medical records and included consideration of additional factors Claimant testified about

Prior to determining that Claimant could perform her past relevant work at step four, the

ALJ determined Claimant's RFC. The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). Here, the ALJ determined Claimant's RFC as follows:

> to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally climb ramps and stairs. She can frequently balance. She can never climb ladders, ropes, or scaffolds. She should avoid workplace hazards such as unprotected heights and moving mechanical parts. She should not work in areas of vibrations. She should avoid working in temperature extremes such as extreme heat and/or cold or humidity and/or wetness. She can occasionally push and pull with the right upper extremity, and can occasionally operate hand controls with the right upper extremity. She can frequently handle and finger with the right upper extremity. She should avoid concentrated exposure to pulmonary irritants such as dusts, odors, toxins, and/or fumes.

(ECF No. 5, PageID #: 81). When supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive—even if this Court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."); *Biestek v. Comm'r of Soc. Sec.,* 880 F.3d 778, 783 (6th Cir. 2017) ("It is not our role to try the case *de novo.*" (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen*, 800 F.2d at 545.

Claimant argues that the medical evidence and testimony support a more limited RFC and contends that the ALJ's RFC determination is flawed for two reasons. First, she argues that the RFC is inaccurate because there is no evidence Claimant is capable of frequently handling and fingering with her right upper extremity. (ECF No. 7 at 12). Second, she claims that the ALJ failed to consider Claimant's need to alternate between sitting, standing, and lying down. (ECF No. 7 at 12).

17

But Claimant's first assertion ignores the ALJ's reliance on medical records from an August 2018 examination and Dr. Inigo's 2020 consultation. (ECF No. 5, PageID #: 86, 87). In both appointments, professionals determined that Claimant was capable of handling and fingering with her upper right extremity. (ECF No. 5, PageID #: 86, 87). The 2018 report showed full range of finger motion, and Dr. Inigo found that Claimant could lift, carry, and handle objects. (ECF No. 5, PageID #: 86). Dr. Inigo also reported that Claimant had normal grip strength bilaterally and an unrestricted ability to reach, handle, finger, and feel. (ECF No. 5, PageID #: 87). In the appointment, Claimant reported that she could write, use a coffee cup, open a jar, and use a skillet. (ECF No. 5, PageID #: 87). These records constitute substantial evidence that Claimant had no restrictions on her fingering and handling abilities, and the ALJ's reliance and factual findings that Claimant could frequently finger and handle were not unreasonable based on the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Claimant next argues that the RFC is inaccurate because the ALJ failed to consider her testimony about the need to alternate between sitting, standing, and lying down. (ECF No. 7 at 12). She also testified about her need to take daily naps as a result of pain medications and claims that the ALJ failed to consider this in the RFC. (ECF No. 7 at 12). However, the ALJ highlighted these conditions in her decision even though Claimant failed to cite any medical record raising these issues or recommending Claimant take alternative positions. (ECF No. 5, PageID #: 82). Further, Claimant's testimony that her pain medication required her to sleep every day is belied by her testimony that she only took the medication on an "as needed" basis. (ECF No. 5, PageID #: 113). Additionally, the vocational expert later testified that Claimant could take breaks every thirty minutes throughout the day and maintain her past relevant work in accordance with her RFC. (ECF No. 5, PageID #: 120). These breaks would provide Claimant with an opportunity to alternate

positioning. Thus, this Court does not find the ALJ erred in her RFC determination because she considered the factors Claimant argued she ignored. This Court finds no reason to overturn the ALJ's RFC determination since the factual findings were reasonable conclusions based on substantial evidence.

### 3. The ALJ's past relevant work determination is credible because it was based on the correct RFC and supported by testimony from a vocational expert

At Step 4, the claimant must prove that she cannot perform her past relevant work as actually or generally performed. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Studaway v. Sec'y of HHS*, 815 F.2d 1074, 1076 (6th Cir. 1978) (noting that the claimant "must prove an inability to return to his former type of work and not just to his former job"). In evaluating whether the claimant can perform her past relevant work, the ALJ must make specific factual findings regarding: (1) the claimant's RFC; (2) the physical and mental demands of the past job/occupation; and (3) whether the claimant's RFC would permit a return to his or her past job or occupation. SSR 82-62, 1982 WL 31386, at *4 (S.S.A. 1982). The claimant's RFC represents their maximum physical and mental abilities, despite the "impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 416.945(a)(1).

The ALJ may ask a vocational expert to testify if the case has complex issues or if the ALJ must determine whether the claimant can perform her past relevant work. 20 C.F.R. § 416.960(b)(2). The ALJ "may use the services of vocational experts or vocational specialists, or other resources, such as the [DOT] . . . to obtain evidence . . . need[ed] to help [him] determine whether [the claimant] can do [her] past relevant work, given [her] residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the

19

claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 416.960(b)(2). If the ALJ asks the vocational expert whether there is a "discrepancy between [the vocational expert's] opinion and the DOT requirements," then the ALJ has complied with agency policy for using a vocational expert. *Beinlich v. Comm'r of Soc. Sec.*, No. 08-4500, 2009 WL 2877930, at *4 (6th Cir. Sept. 9, 2009)). In the Sixth Circuit, "the ALJ is under no obligation to investigate the accuracy of the [vocational expert]'s testimony beyond the inquiry mandated by SSR 00-4p." *Id.* Rather, that "obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the [vocational expert] and bring out any conflicts with the DOT." *Id.*

Claimant challenges the ALJ's past relevant work finding, in part, because it is based on an incorrect RFC. However, as previously discussed, the ALJ's RFC was reasonably based on the medical records provided in the case, and this Court must abide by the finding because it was based on substantial evidence. Aside from the RFC determination, Claimant fails to explain how the ALJ erred in finding that Claimant was capable of past relevant work. Claimant instead rehashes her testimony, listing various conditions she testified about.

This Court finds that the ALJ correctly determined Claimant's past relevant work because she found that Claimant's past work as an Accounting Clerk could be completed with the designated RFC. The ALJ relied on the testimony of a vocational expert, who testified that Claimant could complete the work with the ALJ's designated RFC, and she complied with agency policy by asking the expert whether their testimony was consistent with the information in the Dictionary of Occupational Titles (DOT) and Selected Characteristics of Occupations (SCO). (*See Beinlich*, 2009 WL 2877930, at *4; ECF No. 5, PageID #: 120). Although Claimant contends that the vocational expert testified that under certain restrictions—such as the need to walk around for five to fifteen minutes every half hour—Claimant could not complete the work, these limitations

20

are outside of the determined RFC. (ECF No. 7 at 13–14). Accordingly, this Court finds that the ALJ did not err in determining Claimant's past relevant work experience.

4. **This Court cannot remand Claimant's case for reconsideration of new evidence because Claimant has not proven the evidence is material or that there was good cause to exclude the evidence at the hearing**

In certain cases, a district court may remand a case to the Commissioner to consider new evidence that was not considered at the initial hearing. 42 U.S.C. § 405(g). To obtain a remand, the claimant must show that the evidence (1) would have changed the outcome of the ALJ's decision, (2) is not cumulative of prior evidence, and (3) good cause exists for the claimant's failure to include the evidence in prior proceedings. *Elliot v. Apfel*, 28 F. App'x 420, 423–24 (6th Cir. 2002) (citing *Sizemore v. Sec'y of HHS*, 865 F.2d 709, 711 (6th Cir. 1988)); *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 549 (6th Cir. 2002). Good cause exists when the claimant has "reasonable justification for the failure to acquire and present the evidence." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 485 (6th Cir. 2006) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012); *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (suggesting that claimants meet the good cause prong if they encountered "obstacles" that prevented them from entering evidence).

This standard applies to post-hearing evidence the Appeals Council may reject. *See Wyatt v. Sec'y of HHS*, 974 F. 2d 680, 685 (6th Cir. 1992). In *Wyatt*, the Appeals Council rejected the claimant's request for review and refused to consider new evidence the claimant presented upon appeal—a report obtained one month after the ALJ decision. *Id.* Upon review, the Sixth Circuit applied the same § 405(g) materiality standard to the evidence and rejected the claimant's request

to remand because the new evidence was irrelevant—and thus, immaterial—to the ALJ's decision. *Id.*

Here, the Appeals Council denied Claimant's request for review of the ALJ's decision even though Claimant obtained additional post-hearing evidence. (ECF No. 5, PageID #: 50). Claimant now argues that the Council erred in failing to accept her request and refusing to review June 2021 medical reports which reference three additional injuries. (ECF No. 7 at 14). Although she obtained the report after the ALJ decision, Claimant argues that the record is material because it documents a November 2020 fall that would have affected her health at the time of the hearing. (ECF No. 7 at 15).

There are two 2021 records Claimant requested the Appeals Council review: an initial appointment record where Claimant told the physician she was experiencing lower back pain and a second MRI follow-up appointment. In the initial appointment, Claimant told the physician she fell in November 2020 and hit her lower back. (ECF No. 5, PageID #: 65). Since then, she claimed her lower back pain significantly increased and that she had fallen three additional times since November 2020. (ECF No. 5, PageID #: 65). There are no medical records indicating the dates of the additional falls, and Claimant does not include any dates in her brief. On June 22, 2021, Claimant returned to review the MRI results. (ECF No. 5, PageID #: 61). The physician noted that there were "no signs of infection[,] fracture[,] or other signs of instability," however, he observed that Claimant's gait was "somewhat stiff through her knees with a decreased stride length and a slow gait with knees that show pain by her expression with stepping." (ECF No. 5, PageID #: 61–62). The physician ordered an additional CT scan of the lumbar spine to assess her fusion and back pain, however, Claimant did not submit any additional scans as new evidence (ECF No. 5, PageID #: 62).

The Court is not persuaded that Claimant's new evidence is material or that there was good cause in her failure to submit the records at the initial ALJ hearing. This evidence is immaterial because it would not change the outcome of the ALJ's decision. First, it is difficult to argue this evidence is not cumulative of prior evidence because Claimant testified about the November 2020 fall at the ALJ hearing. (ECF No. 5, PageID #: 108, 113). In her brief, Claimant admits this: "The fall that is referenced in the office note predated the hearing and is a fall that Plaintiff testified to during the hearing." (ECF No. 7 at 15).

If Claimant notified the ALJ about the fall by testifying, it is unlikely a new report of the same injury would change the ALJ's decision. While the records refer to three additional falls, there is no evidence these falls occurred before the ALJ hearing. Additionally, the physician wrote that there were "no signs of [lumbar] infection[,] fracture[,] or other signs of instability" after the falls. (ECF No. 5, PageID #: 62). While Claimant argues that the November 2020 fall "significantly worsened her symptoms," this is inconsistent with the fact that she went eight months—from November 2020 to June 2021—without a doctor's visit. (ECF No. 7 at 15). Further, because significant time elapsed between the fall and her medical appointments, it is difficult, if not impossible, to determine whether the November fall caused the physician's observations about Claimant's gait. Without additional objective evidence, it is unreasonable to assume the fall caused these symptoms. Accordingly, because the June 2021 records do not indicate any serious, objective findings of new injury, they are immaterial and would not change the outcome of the ALJ's decision.

Finally, Claimant's only argument for good cause is that the record did not exist at the time of the hearing. (ECF No. 7 at 15). However, as the *Courter* court held, the "mere fact" that evidence was not in existence at the time of the hearing does not constitute good cause. *See* 479 F. App'x at

725.

This Court denies Claimant's request to remand the case to the Commissioner to review the June 2021 medical report. Claimant has failed to meet the three-prong test demonstrating that the new evidence is material and that there was good cause for failing to submit it before the hearing.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: September 16, 2022

s/ Carmen E. Henderson
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).